The **TRAVELERS INDEMNITY COMPANY,** Defendant Below, Appellant,

v.

**Ben E. LAKE and Bonnie J. Lake,** Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted: Oct. 23, 1990.
Decided: July 2, 1991.

view.

James W. Semple (argued), and Bettina L. Tweardy of Morris, James, Hitchens & Williams, Wilmington, for appellant.

Michael Weiss (argued), of Kimmel, Weiss & Carter, P.A., Wilmington, for appellees.

Christopher J. Curtin, amicus curiae, Delaware Trial Lawyers Ass'n, Wilmington, for appellees.

Before CHRISTIE, C.J., HORSEY, MOORE and WALSH, JJ., and HARTNETT, Vice Chancellor, constituting the Court en Banc.

MOORE, Justice.

In this case we reexamine the *lex loci delicti* rule of *Friday v. Smoot*, Del.Supr., 211 A.2d 594 (1965). The appellee, Ben E. Lake, sued his uninsured motorist carrier, The Travelers Indemnity Company ("Travelers"), in the Delaware Superior Court as the result of an accident in Quebec, Cana-

da, between Lake and an unidentified motorist. Quebec law establishes a legal limit on tort recoveries, which is considerably below the limits of Lake's coverage from Travelers. The insurance policy obligates Travelers to pay damages to Lake which he is "legally entitled to recover" from an uninsured motorist. The Superior Court ruled that Lake's suit was a contract action, and applied Delaware law. We affirm on different grounds. Thus, the limits of Lake's insurance policy, not the tort limits of Quebec, apply. We overrule *Friday v. Smoot* and adopt the prevailing "most significant relationship" test of the RESTATEMENT (SECOND) OF CONFLICTS § 145(1).

## I.

The essential facts are not in dispute. Ben E. Lake was injured in a traffic accident while driving his employer's vehicle in Quebec, Canada. A tailgate from an unidentified truck, driving in an opposite lane, struck Lake's tractor-trailer. Lake lost control of his truck, struck a concrete barrier, and sustained serious injury. The other driver did not stop after the accident. Apparently, there were no eyewitnesses and despite his best efforts, Lake could not locate the other motorist.

At the time of the accident, Lake had an insurance policy with Travelers covering one of his own automobiles not involved in the crash. The policy provides uninsured motorist coverage of $300,000 per occurrence.

Lake sued Travelers in Superior Court for the uninsured motorist benefits of his policy. The parties agreed to arbitrate their dispute, but reserved the right to apply to the court to resolve certain legal issues. Travelers filed a motion *in limine* for a ruling confining its liability under Lake's policy to the limits Quebec law sets for bodily injury. The parties agreed that Lake could recover only $29,400 if the court applied Quebec law, whereas he could recover up to $300,000 if Delaware law applies.

Travelers argued that Quebec law determined what Lake was "legally entitled to

recover" under the terms of his policy. Relying on *Friday*, Travelers reasoned that if Lake had sued the unidentified driver for negligence in Delaware, the court would have applied the *lex loci delicti* choice of law theory thereby confining his recovery to Quebec's $29,400 limit.

The Superior Court rejected Travelers' claim and refused to apply Quebec law. *See Lake v. Travelers Indemnity Co.,* Del.Super., C.A. No. 87C–NO–6–1–CV, 1989 WL 135647 Bifferato, J., Letter op. (Oct. 31, 1989). The court ruled that a suit challenging insurance coverage is an "action *in contract.*" Letter op. at 2 (emphasis in original). Instead of the *lex loci* rule, the court applied the RESTATEMENT (SECOND) OF CONFLICTS "most significant relationship" theory which governs conflict of law problems in contract cases. *Id.* The court ultimately ruled that Delaware had the "most significant relationship" to the insurance policy and decided that Lake was thus "legally entitled" to recover under Delaware law. *Id.*

## A.

■ We start with our standard and scope of review. It is well settled that a suit contesting the construction of an insurance policy is a contract action involving questions of law. *See Aetna Casualty & Surety Co. v. Kenner,* Del.Supr., 570 A.2d 1172, 1174 (1990); *Rohner v. Niemann,* Del.Supr., 380 A.2d 549, 552 (1977). This Court reviews all questions of law *de novo. See Fiduciary Trust Co. N.Y. v. Fiduciary Trust Co. N.Y.,* Del.Supr., 445 A.2d 927, 930 (1982). Moreover, when construing an insurance policy we follow the basic principle that all ambiguities are resolved in favor of the insured. *Steigler v. Ins. Co. N.A.,* Del.Supr., 384 A.2d 398, 400–01 (1978).

### 1.

■ Lake's insurance policy stated in pertinent part:

We (Travelers) will pay damages that the insured (Lake) is *legally entitled to recover from* the owner or *operator of*

*an uninsured highway vehicle* because of bodily injury or property damage sustained by the insured and caused by accident.

(Emphasis added). Lake does not contend that his insurance policy is ambiguous,[1] and Travelers does not argue that it is relieved of all liability to Lake. The parties only dispute the meaning of the contractual language "legally entitled to recover."

Lake contends that Delaware law determines what he was "legally entitled to recover." He agrees with the trial court that cases arising out of insurance policies are contract actions, and justify application of the "most significant relationship" test. Moreover, Lake claims that applying the *lex loci delicti* analysis would violate public policy. He argues that the General Assembly enacted 18 *Del.C.* § 3902 to "fully compensate" Delaware drivers carrying uninsured motorist coverage. Lake basically claims that he is entitled to what he paid for: full protection against uninsured tortfeasors.

Travelers agrees that the interpretation of Lake's insurance policy is a matter of contract law. Travelers argues, however, that contract law is merely an analytical starting point. It claims that Lake was only entitled to recover the same amount under his insurance policy as he would have obtained against the unidentified tortfeasor. Travelers thus concludes that the trial court should have applied the *lex loci delicti* tort law conflicts principle and limited Lake's recovery to amounts specified under Quebec law.

We agree that the trial court prematurely ended its analysis of the choice of law issue when it ruled that the dispute between Travelers and Lake was a contract action. The court should have addressed the novel legal question of whether the tort-based *lex loci delicti* theory governed the limits of Travelers' liability instead of automatically applying the contract-based "most significant relationship" test. We, however, cannot resolve the conflict of law issue and give meaning to Lake's insurance policy without first discussing the Delaware conflict of law rules and examining the policy behind the uninsured motorist statute.

### 2.

The present state of our law in this area is unsettled. Delaware courts apply the modern "most significant relationship" test to resolve conflicts issues arising out of the interpretation and validity of contracts. *See, e.g., Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.,* Del.Supr., 394 A.2d 1160, 1166 (1978); *Nat'l Union Fire Ins. Co. v. RLC Corp.,* Del.Super., 449 A.2d 257, 261, *appeal denied,* Del.Supr., 454 A.2d 765 (1982); RESTATEMENT (SECOND) OF CONFLICTS § 188 (1971). However, we also apply the *lex loci delicti* doctrine in most tort cases. *See Friday,* 211 A.2d at 595; *Short Line, Inc. v. Perez,* Del.Supr., 238 A.2d 341, 343 (1968); *Skillman v. Conner,* Del.Super., 193 A. 563, 565 (1937).

Delaware courts usually classify lawsuits contesting insurance coverage as actions in contract. This Court ruled in *Allstate Ins. Co. v. Spinelli,* Del.Supr., 443 A.2d 1286 (1982), that a suit seeking an award under an uninsured motorist insurance policy "is more nearly akin to a contract claim than a tort action." *Id.* at 1289–90. Allstate argued in *Spinelli* that the statute of limitations governing tort actions barred the plaintiff's suit to collect damages pursuant to his uninsured motorist policy. *Id.* at 1289. The Court rejected

---

**1.** Lake claims that a territorial limitation clause in his insurance policy indicates that Travelers anticipated that Delaware law would govern the damages issue. The clause, appearing in the "General Conditions" section of the policy, states:

> This policy covers only accidents or losses that occur in the United States of America, its territories or possessions, *or in Canada,* or directly between their ports.

(Emphasis added). The territorial limitation provision adds nothing to Lake's claim. Travelers does not contend that it is relieved of all liability for Lake's injuries. Instead, Travelers' appeal concerns the quantum of its liability. The territorial provision merely reaffirms that Travelers is liable for the damages Lake suffered in Canada. Despite Lake's contrary arguments, the territorial clause does not address the applicable legal standard.

Allstate's claim and held that the longer statute of limitations governing contract actions controlled. *Id.* at 1290.

*Spinelli* also recognized a corollary principle. The Court agreed with the trial court's interpretation of the dissent in *Nationwide Ins. Co. v. Rothermel,* Del.Supr., 385 A.2d 691, 694 (1978) (Duffy, J., dissenting), that a plaintiff's personal injuries in an action against his insurance company was not the " 'basis of the cause of action but merely the basis for measuring the damages sustained.' " *Spinelli,* 443 A.2d at 1290 (quoting *Spinelli,* Del. Ch., C.A. No. 6140, Marvel, C., slip op. (Oct. 8, 1980)). Thus, under *Spinelli,* contract law principles do not entirely control suits to recover uninsured motorist awards. Instead, *Spinelli* suggests that a court should use tort law to assess the plaintiff's underlying damages.

### 3.

Any analysis of *Spinelli* also involves consideration of the relevant statutory scheme. A brief review of the law indicates that our initial interpretation of *Spinelli* parallels the general purposes of the uninsured motorist statute.

The Delaware insurance statutes require insurance carriers to provide underinsured/uninsured motorist protection to all Delaware drivers in an amount up to $300,000. 18 *Del.C.* § 3902. Section 3902 provides in part:

(a) No policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle shall be delivered or issued for delivery in this State with respect to any such vehicle registered or principally garaged in this State unless coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured

or hit-and-run vehicles for bodily injury, sickness, disease, including death, or personal property damage resulting from the ownership, maintenance or use of such uninsured or hit-and-run motor vehicle.

Delaware courts have consistently interpreted Section 3902 as a form of supplemental coverage designed to protect Delaware motorists "from an irresponsible driver causing injury or death." *Aetna,* 570 A.2d at 1175 (quoting *Frank v. Horizon Assurance Co.,* Del.Supr., 553 A.2d 1199, 1205 (1989)). *See Adams v. Delmarva Power & Light Co.,* Del.Supr., 575 A.2d 1103, 1107 (1990); *Brown v. Comegys,* Del.Super., 500 A.2d 611, 613 (1985); *O'Hanlon v. Hartford Accident & Indemn. Co.,* 457 F.Supp. 961, 965 (D.Del. 1978), *aff'd,* 639 F.2d 1019 (3d Cir.1981); *see generally State Farm Mut. Auto. Ins. Co. v. Wagamon,* Del.Supr., 541 A.2d 557, 560 (1988). Section 3902 permits a Delaware motorist to "mirror" his own liability coverage and take to the roads knowing " 'that a certain amount of protection will always be available.' " *Adams,* 575 A.2d at 1107 (quoting *Aetna,* 570 A.2d at 1175).

The trial court's application of contract conflict of laws principles to interpret Lake's insurance policy contravenes the mirrored benefits purpose expressed in Section 3902. The court implicitly established an unfair distinction between an uninsured policy claim involving an unknown tortfeasor and a direct tort suit against an identified defendant. For example, Lake does not deny that the court would have applied the *lex loci* rule and limited his recovery to $29,400 if he had found the other driver and sued him in Delaware for negligence. Yet Lake urges the Court to allow him to recover up to the $300,000 limit set in his uninsured motorist policy merely because he could not find the other driver.[2]

---

**2.** Lake alternatively claims that Travelers cannot read his contract hypertechnically because insurance policies are adhesion contracts construed in favor of the insured. *Hallowell v. State Farm Mutual Auto. Ins. Co.,* Del.Supr., 443 A.2d 925, 926 (1982); *Steigler,* 384 A.2d at 401. Lake, however, did not raise his adhesion con-

tract claim below. Nonetheless, we find that our decision in *Hallowell* is not controlling because Lake's insurance policy is not ambiguous. The phrase "legally entitled to recover" is a question of law subject to concise legal definition.

As we have previously observed, the General Assembly enacted Section 3902 to provide only supplemental coverage to protect Delaware drivers from uninsured motorists. *See Adams,* 575 A.2d at 1107; *Frank,* 553 A.2d at 1205; *State Farm Mutual Auto. Ins. Co. v. Hallowell,* Del.Supr., 426 A.2d 822, 826 (1981), *aff'd,* Del.Supr., 443 A.2d 925, 928 (1982). There is no doubt that the court would have awarded a hypothetical plaintiff $29,400 if he sued Lake in Delaware and Lake had caused the accident in Canada. Given the state of the law at the time, the trial court should have applied the tort conflict of laws rules to determine the amount of damages Lake was "legally entitled to recover" under his uninsured motorist policy.[3]

## II.

■■ We turn to the substantive legal doctrines governing choice of law issues in Delaware tort cases. Initially, we note that the *lex loci* doctrine is a legal principle requiring *de novo* review. *See Moss v. Prudential–Bache Securities, Inc.,* Del. Supr., 581 A.2d 1138, 1140 (1990); *Fiduciary Trust Co. N.Y. v. Fiduciary Trust Co. N.Y.,* Del.Supr., 445 A.2d 927, 930 (1982).

### A.

In *Friday* we confirmed the principle that Delaware courts apply the *lex loci delicti* choice of law theory in tort cases. 211 A.2d at 595. Accordingly, *Friday* held that:

> [T]he law of the place in which a tort takes place governs the substantive rights of the parties in an action based upon the tort brought in Delaware.

*Id.* Lake now urges the Court to abandon the *lex loci* rule in favor of the more flexible RESTATEMENT (SECOND) OF CONFLICTS "most significant relationship" approach. Lake claims that the *lex loci* test often leads to unjust results. He also claims that the theoretical assumptions supporting the old rule are outdated. Lake points to the fact that a clear majority of the states have already abandoned *lex loci* in tort cases.

We agree that it is appropriate to reexamine the *lex loci* doctrine.[4] The law has changed dramatically in the decades since *Friday* was decided. The so-called "litigation explosion" has congested our courts with an ever-increasing number of tort suits. Concurrently, our society has become even more mobile and transitory.

### B.

In *Friday,* the Court was confronted with the decision whether to retain the *lex loci* rule or apply the then new Restatement (Second) approach. *Friday* retained the old rule for three basic reasons: (1) the *lex loci* rule was more predictable and certain; (2) abandoning the *lex loci* rule would encourage forum shopping; and (3) only the legislature could repeal the doctrine because it would represent "a major change" in the law. *See* 211 A.2d at 596–97. A brief review of the inherent doctrinal assumptions of the *lex loci* rule indicate that an unquestioning adherence to "predictability" is not warranted where changes in the law and national life have eroded the foundation of a legal principle.

*Friday* explicitly relied on both the First Restatement and a noted treatise when it retained *lex loci. See* 211 A.2d at 594 (citing RESTATEMENT OF CONFLICTS § 378 (1934); 2 J. BEALE, THE CON-

---

3. We note that at least one court applying Delaware law has agreed that "an insured may [not] recover more damages from the [uninsured motorist] carrier than she could have recovered in a suit directly against the negligent motorist." *Caruso v. Prudential Property & Casualty Ins. Co.,* Civ. A. No. 85–708 MMS, Schwartz, J., slip op. at 6 (D.Del. Nov. 20, 1986) (Mem.). *See, e.g., Brown,* 500 A.2d at 614 (plaintiff only entitled to recover under uninsured motorist coverage "all of the traditional elements of damages which he would have been able to recover against the uninsured tortfeasor.")

4. We asked the parties to brief this important issue after we heard oral argument. *See Travelers Indemnity Co. v. Lake,* Del.Supr., No. 515, 1989, Moore, J. (Oct. 24, 1990) (ORDER); *cf. Newmark v. DCPS,* Del.Supr., 588 A.2d 1108, 1114 (1991). The Delaware Trial Lawyers Association also filed an amicus brief urging this Court to abandon *lex loci* in torts cases. Thereafter, we heard oral argument on this issue.

FLICT OF LAWS § 378.2 (1935)). Professor Beale is credited with conceiving and drafting the First Restatement of Conflicts. *See* T.M. de BOER, BEYOND LEX LOCI DELICTI 3–198 (1987). Beale was also a proponent of the vested rights theory of conflicts which is the doctrinal source of the *lex loci* rule. *See id.;* RESTATEMENT (SECOND) OF CONFLICTS ch. 7 at 412 (1971) (Introductory Note); J. MARTIN, PERSPECTIVES ON CONFLICT OF LAWS: CHOICE OF LAW 1 (1980).

The vested rights doctrine is a common law theory first discussed in Justice Storey's classic treatise COMMENTARIES ON THE CONFLICT OF LAWS, FOREIGN AND DOMESTIC (1834). *See* W. COOK, THE LOGICAL AND LEGAL BASES OF THE CONFLICT OF LAWS 48 (1942). The vested rights theory is founded on respect for a state's *territorial* sanctity and evolves from a series of "logical" postulates. *See* COOK, *supra,* at 49. Basically, the vested rights theory assumes: (1) that the laws of a jurisdiction have no "intrinsic force" beyond its territorial boundaries; and (2) the laws of every state bind all property and persons within its territorial jurisdiction. *Id.* (citing J. STORY, COMMENTARIES ON THE CONFLICT OF LAWS §§ 7–8, 17, 18 (8th ed. 1883)). Beale surmised from these two basic postulates that:

It is impossible for a plaintiff to recover in tort unless he has been given by some law a cause of action in tort; and this cause of action can be given only by the law of the place where the tort was committed.

BEALE, *supra,* § 378.1 at 1288. The vested rights theory thus posits that states must uniformly respect the laws of the territory where the tort "right" first came into existence.

Most American courts, however, have completely abandoned the vested rights theory and its doctrinal cousin *lex loci. See, e.g.,* R. LEFLAR, L. MCDOUGAL & R. FELIX, AMERICAN CONFLICTS LAW § 134 at 373–378 (4th ed. 1986); Reese, *Choice Of Law: Rules Or Approach,* 57 CORNELL L.REV. 315, 321 (1972), (advantages of applying *lex loci* "are bought at a price the courts have been unwilling to pay.") Commentators have critiqued the vested rights theory because it ignores the substantive content of a jurisdiction's legal rules and instead focuses on the territorial aspects of the "right." *See* Cavers, *A Critique of the Choice–of–Law Problem,* 47 HARV.L.REV. 173, 178 (1933); *see generally* COOK, *supra;* Currie, *On the Displacement of the Law of the Forum,* 58 COLUM.L.REV. 964 (1958). Basically, other than respect for territorial boundaries, the vested rights theory does not adequately explain why a court must apply the law of the place where the tort occurs. *See* N. HANCOCK, TORTS IN THE CONFLICT OF LAWS 36 (1942).

The Second Restatement of Conflicts also recognized the fundamental problem with the vested rights theory and the *lex loci* doctrine, since the last place of injury only bears "a slight relationship to the occurrence and the parties...." RESTATEMENT (SECOND) OF CONFLICTS ch. 7 at 413 (1971) (Introductory Note). The Restatement also noted the increasing abandonment of the vested rights approach:

Judges are more prepared than formerly to consider the basic policies and values underlying choice of law. In reaching their decisions, the judges give greater weight to the [new Restatement "most significant relationship" test] than to the demands of some legal theory, as that of vested rights.

*Id.*

The Second Restatement also recognized that fundamental changes in American society made the *lex loci* doctrine obsolete. The vested rights theory, with its emphasis on territorial boundaries, had little relevance in the modern industrial world. The Restatement commented:

State and national boundaries are of less significance today by reason of the increased mobility of our population and of the increasing tendency of men to conduct their affairs across boundary lines.

*Id. See Gutierrez v. Collins,* 583 S.W.2d 312, 317 (Tex.1979).

Thus, over thirty-one states now have rejected the *lex loci* doctrine in tort cases.

We recognize that "we do not meet our responsibilities by merely counting jurisdictions." *Steigler v. Ins. Co. of N.A.*, Del. Supr., 384 A.2d 398, 400 (1978). Nonetheless, we also cannot ignore the realities of modern jurisprudence and informed scholarly debate. As we have previously stated:

> The law should be an ever developing body of doctrines, precepts, and rules designed to meet the evolving needs of society.... While *stare decisis* has its place, the strength of the Common Law is its ability to grow and respond to the realities of life. Absent this, the law fails in its vital purpose.

*Monroe Park v. Metropolitan Life Ins. Co.*, Del.Supr., 457 A.2d 734, 738 (1983). No clearer example of this evolving nature of the law is found in the area under discussion, and the treatment it has received in the Restatement.

Having briefly chronicled the fundamental weaknesses of the *lex loci* doctrine, we turn to its supposed strengths. Travelers vigorously argues that predictability and certainty is the major asset of *lex loci*. It claims that applying the law of the state where the injury occurred makes "facile the prediction of applicable tort law for claimants, insurers, lawyers and judges." A brief review of our own *lex loci* jurisprudence makes it quite clear that application of the *lex loci* doctrine is anything but facile.

First, and most significantly, this Court has already abandoned the *lex loci* doctrine for contracts cases. *See Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.*, Del. Supr., 394 A.2d 1160, 1166 (1978); *Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.*, Del.Super., 564 A.2d 681, 688 & n. 10 (1989), *cert. denied,* — U.S. ——, 110 S.Ct. 758, 107 L.Ed.2d 774 (1990); *Nat'l Union Fire Ins. Co. v. RLC Corp.*, Del.Super., 449 A.2d 257, 261 (1982). Accordingly, as Travelers itself suggests, one way to avoid an unduly harsh application of *lex loci delicti* is to treat a tort-like case as a contract action. *Cf. Folk v. York–Shipley, Inc.*, Del.Supr., 239 A.2d 236, 238–40 (1968) (court applied *lex loci delicti* because wife's suit for loss of consortium not distinct from husband's suit for personal injuries.) Travelers, however, misses the fundamental point that attempting to characterize a lawsuit with both tort and contract characteristics is no easier or more predictable than applying the alternatives to *lex loci*. *See infra* Part I.A. Of course, the only reason why the court even has this choice is that Delaware recognizes different conflict of law principles for both torts and contracts suits. At present Delaware is one of only two jurisdictions that still recognize *lex loci* for torts, but apply the most significant relationship test on contract cases. *See* Smith, *Choice of Law in the United States*, 38 HASTINGS L.J. 1041, 1172–74 (1987) (chart graphing choice of law rules).

Second, Travelers argues that *lex loci* is more predictable. It contends that the choice of law alternatives are too vague and difficult to apply. Travelers, however, again fails to recognize that the *lex loci* doctrine is almost meaningless when considered in relation to its own broad exceptions.

Delaware courts recognize two basic exceptions to the *lex loci* rule. First, courts ignore *lex loci* when they determine that the issue in question is procedural. *See Short Line, Inc. v. Perez*, Del.Supr., 238 A.2d 341, 343 (1968); *Friday*, 211 A.2d at 595; *Skillman v. Conner*, Del.Super., 193 A. 563, 565 (1937). Second, Delaware courts refuse to apply *lex loci* when the law of the state where the accident occurred "is clearly repugnant to the settled public policy of [Delaware] the forum." *Skillman*, 193 A. at 565; *see Short Line, Inc.*, 238 A.2d at 343; *Gorman v. Murphy Diesel Co.*, Del.Super., 29 A.2d 145, 146–47 (1942). A court is thus authorized, under the public policy exception of the *lex loci* rule, to abandon another state's law when its laws violate Delaware's public policy. *Id.*

The public policy exception to the *lex loci* rule undercuts the certainty and predictability it was designed to promote. *Cf.* Smith, *supra*, at 1043 n. 12 (*lex loci* as applied to contracts in the First Restatement critiqued for its many exceptions and

"escape devices.") Indeed, Lake and Travelers dedicated large sections of their briefs contesting the applicability of the public policy exception. We do not see how a court could apply *lex loci* without first considering Delaware public policy. When viewed in its most abstract form, the public policy exception is really no more than a principle which recognizes that the so-called territorial justification, inherent in the vested rights theory, is subordinate to the substantive laws of the forum state.

Finally, *Friday* refused to abandon *lex loci* because it feared that repealing the doctrine would encourage forum shopping. The Court, employing a hypothetical where two Delaware residents sued each other for negligence inflicted in another state, claimed that adopting the Restatement test would drive the Delaware residents to seek relief in a state that recognized *lex loci.* 211 A.2d at 597. Such reasoning is not compelling in today's world.

First, when the Court decided *Friday,* only three states had adopted the new Restatement rule. Now, thirty-one states have rejected *lex loci.* The danger of forum shopping is obviously of reduced significance. Second, there is little we can do to prevent litigants from asserting their rights in the appropriate forum of their choice. While we discourage the use of Delaware courts as forum shopping venues, litigants generally have the right to pick their own forum as long as they satisfy all relevant jurisdictional requirements.

Finally, Travelers relies on *Friday*'s *dictum* that we could not rescind the *lex loci* doctrine without legislative action. The rationale being that it would represent a "major change" in the law. 211 A.2d at 597. That notion is unpersuasive in view of the origins of the *lex loci* doctrine.

The *lex loci* doctrine was purely a judicial creation. *See* HANCOCK, *supra,* at 30–36. The General Assembly has never mandated the application of *lex loci delicti* to tort cases, and we doubt that it would ever do so. Indeed, Delaware traces the origins of its *lex loci* theory to the common law and Beale's original treatises on conflicts. *See Friday,* 211 A.2d at 595; *Skillman,* 193 A. at 565. Additionally, at least

two other jurisdictions have also recognized that *lex loci* was an artificial product of the common law vested rights theory. *See O'Connor v. O'Connor,* 201 Conn. 632, 643, 519 A.2d 13, 18 (Conn.1986); *Gutierrez,* 583 S.W.2d at 314–316.

While we do not ignore our duty to ensure that our decisions are uniform and predictable, we also have a corresponding duty to recognize change and to participate in the growth of the law. *See Duvall v. Charles Connell Roofing,* Del.Supr., 564 A.2d 1132, 1134 (1989); *Monroe Park,* 457 A.2d at 738; *Wilmington Housing Authority v. Fidelity & Deposit Co.,* Del. Supr., 47 A.2d 524, 529 (1946). It is not without some irony that this Court overruled the old *lex loci contractus* choice of law doctrine in contract cases without showing concern for the necessity of legislative action. *See, e.g., Oliver B. Cannon & Son, Inc.,* 394 A.2d at 1166; *Playtex Family Products, Inc.,* 564 A.2d at 688. A court clearly has the authority, indeed the responsibility, to overrule its own common law decisions when they lose their legal vitality. *See Duvall,* 564 A.2d at 1134 (Court abandoned "unusual exertion rule" because it "is both legally unsound and inequitable....") *See also O'Connor,* 201 Conn. at 639, 519 A.2d at 16, *Gutierrez,* 583 S.W.2d at 317 ("the genius of the common law rests in its ability to change, to recognize when a time-worn rule no longer serves the needs of society....").

Thus, we overrule *Friday v. Smoot* and its automatic *lex loci delicti* choice of law standard. It is a doctrine that has lost its place in the growth of modern law.

### C.

This brings us to the question of what choice of law doctrine a court should apply to decide tort cases. Other courts that have considered the issue generally refer to three supposedly distinct legal theories: (1) the "most significant relationship" choice of law doctrine recognized in the RESTATEMENT (SECOND) OF CONFLICTS; (2) Professor Brainerd Currie's "governmental interest approach"; and (3) Professor Robert Leflar's choice of law

theory that considers five "choice-influencing considerations." *See O'Connor*, 201 Conn. at 648–49, 519 A.2d at 13. However, we need not dwell on the efficacy of these three theories. Almost all cases and commentators refer to the Restatement's flexible "most significant relationship test." *See O'Connor*, 201 Conn. at 649–50, 519 A.2d at 21–22; *Gutierrez*, 583 S.W.2d at 318; *see also* Reese, *The Second Restatement of Conflict of Laws Revisited*, 34 MERCER L.REV. 501, 519 (1983). As *Gutierrez*, quoting Professor Leflar, succinctly stated:

A considerable number of the opinions cite the various theorists almost interchangeably, and rely upon just about any precedent that has rejected the old *lex loci delicti* rule. They can and do rely upon the Restatement (Second) which, though it uses the phrase 'most significant relationship', actually in its controlling § 6 and elsewhere *includes most of the substance of all the modern thinking on choice of law*.

583 S.W.2d at 318 (quoting R. LEFLAR, AMERICAN CONFLICTS LAW § 139 (3d ed. 1977)) (emphasis added).

We agree. Indeed, a majority of the states abandoning *lex loci* have adopted the Restatement rule. *See O'Connor*, 201 Conn. at 649; 519 A.2d at 21. This Court's reliance on the Restatement "most significant relationship" test for contracts cases further buttresses our decision to apply the Restatement test to tort suits. This brings the choice of law doctrines back into conformity by eliminating the often artificially contrived tort/contract distinctions that previously existed in our law.

1.

Pursuant to Section 145 of the Second Restatement, the local law of the state which "has the most significant relationship to the occurrence and the parties under the principles stated in § 6" will govern the rights of litigants in a tort suit. RESTATEMENT (SECOND) OF CONFLICTS § 145(1) (1971). Section Six of the Restatement lists the following relevant choice of law considerations:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.* at § 6.

Section 145 lists the following relevant contacts a court should consider when applying Section Six:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.*

Finally, Section 146 specifically directs the court to apply the law of the state where the injury occurred in a "personal injury case" unless the forum state has more "significant relationship" under the Section Six principles to the "occurrence and the parties." *Id.* at § 146. The commentary to Section 146 confines its definition of personal injury to either "physical harm or mental disturbance ... resulting from physical harm or from threatened physical harm or other injury to oneself or to another." *Id.* § 146 comment b.

2.

■ In view of the Restatement's tests, we consider whether the substantive law of Delaware or Quebec applies here. What is Quebec's interest? The relevant Quebec statutory scheme envisions a system of no-fault insurance limiting a negligent driver's liability to a predetermined amount of damages. QUE.REV.STAT. ch. A–25, tit. II. The Connecticut Supreme Court, in evaluat-

ing the same relevant sections of the Quebec statute, found that Quebec law "eschews investigation into the possible negligence of the defendant's conduct and limits the amount of damages the victim of the defendant's conduct may recover." *O'Connor*, 201 Conn. at 654, 519 A.2d at 24. As we previously noted, Lake's damages would be limited to $29,400 if Quebec law applies.

There is no compelling issue of Quebec public policy here. *Id.* *O'Connor*, at 655, 519 A.2d at 24. The parties are not residents of Quebec. The truck Lake was driving when the accident occurred was not registered in Quebec. The only connection with Quebec is that the accident occurred there.

In comparison, Delaware clearly has the "most significant relationship" to the issues presented. Lake is a resident of Delaware. Travelers obviously conducts substantial business here. The uninsured motorist coverage provision of Lake's policy arose out of Delaware law and involves issues of vital importance to all Delaware citizens. *See supra* Part I. Finally, unlike Quebec, Delaware generally does not endorse a no-fault system of tort law.[5] Delaware courts always consider fault in assessing liability in torts cases. *See generally Deangelis v. U.S.A.C. Transport, Inc.*, Del.Super., 105 A.2d 458, 460 (1954); *Kane v. Reed*, Del.Super., 101 A.2d 800, 801 (1954).

■■■ Adoption of the most significant relationship test does not require a court to disregard a foreign jurisdiction's law in all torts cases. The flexibility of this doctrine requires that each case be decided on its own facts.[6] Based upon the foregoing, the judgment of the Superior Court, refusing to restrict Lake's no-fault insurance claim under Quebec law, is AFFIRMED.

___

**5.** An important exception is the legislature's decision to adopt a modified no-fault system of personal injury protection coverage in automobile insurance cases. *See* 21 *Del.C.* § 2118; *DeVincentis v. Maryland Casualty Co.*, Del.Super., 325 A.2d 610, 612 (1974).

**6.** We add the cautionary note that the Restatement test does not authorize a court to simply add up the interests on both sides of the equation and automatically apply the law of the jurisdiction meeting the highest number of contacts listed in Sections 145 and 6. Section 145 has a qualitative aspect. It clearly states that

the "contacts are to be evaluated according to their relative importance with respect to the particular issue." RESTATEMENT (SECOND) OF CONFLICTS § 145 (1971); *see O'Connor*, 201 Conn. at 653, 519 A.2d at 23; *Kennedy v. Dixon*, 439 S.W.2d 173, 184–85 (Mo.1969) (en banc). Here, the issue concerning the quantum of Lake's damages has a much more significant relationship to Delaware law and public policy than Quebec. *See* 18 *Del.C.* § 3902; *Adams*, 575 A.2d at 1107; *Kenner*, 570 A.2d at 1175; *Frank*, 553 A.2d at 1205.